IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES FIELDS, | ) | CASE NO. 1:20-CV-02376-JDG |
| Plaintiff, | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | |

Plaintiff, Charles Fields ("Plaintiff" or "Fields"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

I. PROCEDURAL HISTORY

In August 2018, Fields filed an application for POD, DIB, and SSI, alleging a disability onset date of June 1, 2018 and claiming he was disabled due to severe alcoholism, adjustment disorder, and left foot injury. (Transcript ("Tr.") at 10, 92, 99, 106, 113.) The applications were denied initially and upon reconsideration, and Fields requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 10.)

---
[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On September 24, 2019, an ALJ held a hearing, during which Fields, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On November 5, 2019, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 10-27.) The ALJ' s decision became final on August 17, 2020, when the Appeals Council declined further review. (*Id.* at 1-6.)

On October 19, 2020, Fields filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 19, 21.) Fields asserts the following assignments of error:

(1) The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul is constitutionally defective.

(2) The ALJ erroneously failed to properly evaluate the totality of the evidence in the record when she formed her RFC.

(3) The ALJ erroneously failed to find that Fields had disabling pain and failed to find that his testimony and the opinions of both his wife and the treating sources were credible or persuasive.

(4) At Step Four of the Sequential Evaluation, the ALJ's RFC was not supported by substantial evidence when she erroneously found that Fields could still perform his past work as a laundry laborer and kitchen helper at the medium level of exertion.

(Doc. No. 15 at 1.)

## II.     EVIDENCE

**A.     Personal and Vocational Evidence**

Fields was born in January 1967 and was 52 years-old at the time of his administrative hearing (Tr. 10, 92), making him a "person closely approaching advanced age" under Social Security regulations. 20 C.F.R. §§ 404.1563(d), 416.963(d). He has a limited education and is able to communicate in English. (Tr. 66.) He has past relevant work as a laundry laborer and kitchen helper. (*Id.* at 26.)

**B.     Relevant Medical Evidence[2]**

An August 10, 2017 x-ray of Fields' left foot revealed osteoarthritic changes at the first metatarsophalangeal joint with hallux valgus deformity, unchanged from June 24, 2017, and plantar/lateral soft tissue swelling of the forefoot similar to the previous study. (Tr. 307-08.)

On August 31, 2017, Fields underwent surgery for his left hallux abductovalgus deformity, left plantar flexed fourth metatarsal, and painful left foot. (*Id.* at 313-16.)

A September 7, 2017 x-ray of Fields' left foot revealed "[r]edemonstration of an osteotomy of the 4th metatarsal neck with mild interval displacement of the head of the 4th metatarsal" and "[s]table post surgical changes at the 1st metatarsophalangeal joint with expected postoperative findings." (*Id.* at 311.)

On November 1, 2017, Fields saw Dr. Terence Isakov to establish care. (*Id.* at 377.) Fields denied pain in his left foot and reported he needed to have the bunion on his right foot removed as well. (*Id.*) Fields also complained of occasional headaches and fatigue. (*Id.*) On examination, Dr. Isakov found normal range of motion, nontender bunion on the right foot, normal gait, and well-healing incision on the left foot from bunion removal. (*Id.* at 378.)

Fields was hospitalized at Marymount Hospital from July 19-20, 2018 for suicidal and homicidal ideation because of alcohol intoxication and stress from losing his job, being newly married, and the murder of a childhood friend. (*Id.* at 361.) Fields declined psychiatric mediation and improved without them. (*Id.*) On examination at discharge, Fields demonstrated appropriate behavior, euthymic mood, coherent thought form and content, fair judgment, intact memory/cognition, and normal psychomotor activity. (*Id.* at 362.) Fields' diagnoses included adjustment disorder with mixed anxiety and depressed mood and substance-related disorder, alcohol use disorders, intoxication. (*Id.* at 361.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On August 21, 2018, Fields saw Dr. Isakov for follow up. (*Id.* at 370.) Fields reported feeling well and working at Bob Evans as a line cook. (*Id.*) Fields denied back pain, joint pain, and neck pain. (*Id.*) On examination, Dr. Isakov found normal range of motion and no edema or tenderness. (*Id.* at 371.)

On October 4, 2018, Fields saw Deborah Koricke, Ph.D., for a consultative psychological evaluation. (*Id.* at 382-89.) Fields reported working at Bob Evans as a dishwasher for 20 to 25 hours a week. (*Id.* at 383.) Fields told Dr. Koricke he had been "fired at least five times for inadequate work behaviors which he describe[d] as, 'don't follow up, lose interest in jobs real quick,'" as well as "problems with bosses" because he did not want "to hear things over and over." (*Id.* at 383-84.) Fields endorsed problems getting along with people and taking orders but denied being anxious or having panic attacks. (*Id.* at 385.) On examination, Dr. Koricke found Fields' posture, gait, and motor behavior within normal limits, good eye contact, normal speech, coherent and goal-directed thought process, full range of affect that was appropriate to speech and thought content, and depressed mood. (*Id.* at 386-87.) While Fields reported auditory hallucinations, Dr. Koricke noted what Fields reported were not typical of auditory hallucinations. (*Id.* at 386.) Fields refused to count back from 100 by sevens or from 20 by threes. (*Id.* at 387.) Dr. Koricke noted Fields appeared to have somewhat below average intellectual functioning. (*Id.*) Fields thought there were only 12 weeks in a year and was unable to spell "world" correctly. (*Id.*) Fields was able to repeat five digits forward and two digits backward. (*Id.*) Dr. Koricke determined Fields appeared to have "some minimal insight that his drinking is something that he cannot control and that he should not be drinking," but noted that "his insight was limited in that he has not followed up ever with a mental health provider to have any treatment despite reporting various serious symptoms." (*Id.*) Fields reported he was not good with money and asked that his wife be the payee for any benefits. (*Id.* at 388.) Fields denied any restrictions in cleaning, cooking, laundry, or bathing and told Dr. Koricke he enjoyed lifting weights, listening to the radio, talking to friends, and watching TV. (*Id.*) Dr. Koricke diagnosed

Fields with alcohol abuse, severe, in early full remission, and noted that Fields at times appeared to be exaggerating his situation. (*Id.*)

On October 23, 2018, Fields saw Michael Canales, DPM, for a post-surgery follow up appointment. (*Id.* at 486.) Fields complained of pain in his left big toe as well as his right, although his left was getting worse. (*Id.*) Fields reported a pain flare over the past week and told Dr. Canales he wanted to get this fixed, although he admitted he was still smoking. (*Id.*) On examination, Dr. Canales found pain to palpation of the left first MPJ region, no motion noted at that joint, and edema. (*Id.*) On the right, Dr. Canales also found pain to palpation of the right first MPJ region, decreased range of motion, and abducted hallux. (*Id.*) Dr. Canales noted "prominent medial eminence bilaterally, although it is more severe on the right than the left." (*Id.*) Dr. Canales diagnosed Fields with gangrene of the left first metatarsophalangeal joint and hallux rigidus on the left. (*Id.*) Dr. Canales prescribed Meloxicam and ordered Fields to return in six weeks to discuss possible revision of the left first MPJ fusion. (*Id.*)

On December 4, 2018, Fields saw Dr. Canales for a post-surgery follow up appointment. (*Id.* at 406.) Dr. Canales noted Fields had a "well-known nonunion appreciated to the 1st MPJ secondary to likely smoking as well as noncompliance following surgery." (*Id.*) Fields reported continued persistent swelling and pain in his foot. (*Id.*) Dr. Canales noted Fields knew he needed to undergo revisional surgery and wanted to schedule it for after the new year. (*Id.*) On examination, Dr. Canales found moderate non-pitting edema to the first ray of the left foot at the level of the first MPJ secondary to nonunion, as well as "significant erythema" at the nonunion site, although there was no proximal streaking, drainage, or clinical signs of infection. (*Id.*) Dr. Canales also found tenderness to palpation and "very minimal range of motion" at the first MPJ fusion strength, as well as 5/5 muscle strength of the bilateral lower extremities. (*Id.*) Dr. Canales emphasized Fields needed to stop smoking and agree to be compliant with non-weightbearing for 4-6 weeks after revisional surgery. (*Id.* at 406-07.)

On January 29, 2019, Fields underwent an initial mental health assessment at Signature Health, Inc. (*Id.* at 415.)  Fields reported the counselor he and his wife were seeing referred him to Signature Health; the counselor felt he could benefit from psychiatry because of his anxiety and ADHD. (*Id.*)  Fields reported checking the doors in his house several times a night and checking things over and over again at work. (*Id.*)  Fields also reported becoming distracted when watching movies or television. (*Id.*)

On February 22, 2019, Fields saw Kelly Scott, APN, at Signature Health for follow up. (*Id.* at 416.)  Fields denied decreased range of motion or pain. (*Id.* at 417.)  Fields reported having a stressful morning and being anxious, as well as improved sleep. (*Id.* at 421.)  Scott noted Fields worked for a church. (*Id.*)  Fields reported a history of agitation, irritability, and trouble sleeping when depressed, increased goal-directed activities, racing thoughts, distractibility, decreased need for sleep, and spending money on frivolous things when manic, impulsive thoughts and behaviors, being easily distracted, poor concentration and attention, and restlessness. (*Id.* at 421-22.)  On examination, Scott found Fields casually dressed and anxious with good eye contact, normal muscle strength and tone, symmetrical steady gait and station, attentive with an anxious mood and congruent affect, normal speech, linear, goal-oriented thought process, intact memory, good judgment, and fair insight. (*Id.* at 418.)  Fields' diagnoses included bipolar disorder, most recent episode (or current) manic, moderate, and anxiety state, unspecified. (*Id.* at 419.)  Scott increased Fields' Depakote and Trazadone and recommended individual counseling. (*Id.* at 422.)

On July 24, 2019, Fields' wife completed an Adult Function Report. (*Id.* at 289-96.)  She reported Fields could not stand for long on his left foot because of pain and discomfort, and his mental illness kept him from being productive in the work force and often led to him getting in fights and altercations with others. (*Id.* at 289.)  By the time she woke up in the morning to take her medication, Fields would have lots of different projects going on, including mowing the lawn, washing dishes, painting, cooking,

washing laundry, and washing the dog. (*Id.* at 290.) Fields prepared sandwiches sometimes and full course meals sometimes, although everything was quick and pre-prepped. (*Id.* at 291.) Because of his asthma and left foot, Fields took a lot of breaks. (*Id.*) It took Fields all day to do chores. (*Id.*) He shopped in stores one to two times a week for about thirty to sixty minutes. (*Id.* at 292.) His left foot pain would not allow him to do his hobbies as often as before and he had become irritated with gardening. (*Id.* at 293.) He went to church twice a week. (*Id.*) Fields became agitated very quickly, lost interest quickly, and wanted to be alone. (*Id.* at 294.) His wife estimated he could lift 40 pounds, stand for 15 minutes, walk for 15 minutes, kneel for 10 minutes, climb stairs for 10 minutes, and concentrate for a short period of time. (*Id.*) He could not get along with others very often. (*Id.*) Fields "fell apart" when stress was high and did not handle change well. (*Id.* at 295.)

On July 29, 2019, Scott completed a Mental Impairment Questionnaire. (*Id.* at 411-13.) Scott noted Fields was seen every four weeks consistently. (*Id.* at 411.) Fields' mental health symptoms included signs of moderate agitation, impulsivity, racing thoughts, poor concentration, and distractibility. (*Id.*) Scott opined Fields was unable to meet competitive standards in the following areas: manage regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and understand and remember detailed instructions. (*Id.* at 411, 413.) Scott further opined Fields' mental health symptoms would cause Fields to be off-task for eight hours out of an eight-hour workday. (*Id.* at 413.)

On August 2, 2019, Fields saw Dr. Isakov for follow up. (*Id.* at 462.) Dr Isakov added bipolar affective disorder to Fields' diagnoses. (*Id.* at 463.)

### C. State Agency Reports

#### 1. Mental Impairments

On October 23, 2018, Todd Finnerty, Psy.D., opined Fields could sustain a static set of tasks without fast pace, could interact with others on a superficial basis, and could adapt to a setting where duties are relatively static and changes are infrequent and can be adjusted to over time. (*Id.* at 96, 101-102.) Dr. Finnerty further opined Fields could adapt to a setting which does not require frequent shifting through a large variety of unrelated duties where he would be asked to frequently go from one task to another without losing efficiency or composure. (*Id.*)

On December 13, 2018, on reconsideration, Sandra Banks, Ph.D., added a limitation that Fields could understand and remember simple and some moderately complex instructions for tasks and could sustain attention for simple, repetitive tasks that did not require a fast pace. (*Id.* at 109-11, 116-18.) Dr. Banks also modified the limitation to interacting with others to occasional as well as superficial. (*Id.*) Dr. Banks affirmed Dr. Finnerty's other findings. (*Id.*)

#### 2. Physical Impairments

On September 17, 2018, Leanne Bertani, M.D., opined Fields could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and could frequently push/pull with the bilateral lower extremities. (*Id.* at 95, 101.)

On December 13, 2018, on reconsideration, Gary Hinzman, M.D., affirmed Dr. Bertani's findings. (*Id.* at 108-09, 115-16.)

### D. Hearing Testimony

During the September 24, 2019, 2019 hearing, Fields testified to the following:

- He went to school through the tenth grade. (*Id.* at 66.)

8

- He worked at Bob Evans in 2018. (*Id.* at 67, 69.) He worked as a line cook for a couple weeks before moved him to the dish tank because he kept having to sit down and was holding up other people. (*Id.* at 68.) He could not sit when doing that job but he could move at his own pace if it was a slow day. (*Id.*) On the weekends, two other guys worked the dish tank with him so he could go and sit down. (*Id.*) He had to stop working there because of his health issues; he just could not keep up. (*Id.* at 69.) He worked a machine operator job for a short time because he could not cut it. (*Id.* at 69-70.) He also worked at a laundry service for a short time. (*Id.* at 70-73.) He worked at Amazon in December 2018 scanning packages but could not even make it a week because he could not stand. (*Id.* at 73.) He was either getting fired or getting let go because he could not keep up as a result of his foot swelling or his back locking up. (*Id.* at 74.)

- His left foot swells up and aches badly. (*Id.* at 75.) It swells every other day. (*Id.*) It will swell up if he is on it too long, and even when he is sitting down it aches. (*Id.*) He needs to stay medicated. (*Id.*) He cannot stand for an hour before it starts to swell. (*Id.*) When it swells, he has to sit down, take his medication, and elevate his foot. (*Id.* at 75-76.) The week prior he was at the park with his four-year-old granddaughter and his back started hurting so badly he could not move. (*Id.* at 76.) He had to call his daughter to come from work. (*Id.*)

- He also gets lower right side back pain daily that he rated a 7/10. (*Id.*)

- He could stand for maybe half an hour if he was trying to wash dishes. (*Id.* at 77.) He could walk for maybe a block and a half. (*Id.*) He could sit for an hour or hour and a half before he would need to stand up and stretch. (*Id.*)

- The biggest issue is his inability to stand and walk. (*Id.* at 78.) Then he gets depressed because he cannot do things. (*Id.*)

- When he gets depressed, he isolates himself in a dark room and does not want to be bothered. (*Id.*) His concentration is bad. (*Id.* at 81.) He feels helpless or hopeless every day. (*Id.* at 82.)

- He tries to wash dishes and might vacuum the floor. (*Id.* at 83.) The day before he tried to vacuum but had to sit down after five minutes. (*Id.* at 84.) He tries to cook but it has to be something quick. (*Id.*) He will fold his clothes, but his wife and daughter take the laundry to the basement and load it into the washer and dryer. (*Id.*)

- He does not socialize with people outside of his wife and his pastor at church. (*Id.* at 85.)

The VE testified Fields had past work as a kitchen helper and laundry laborer. (*Id.* at 87.) The ALJ then posed the following hypothetical question:

9

> [I]f you would assume a person of the Claimant's age, education and that past relevant work activity who has the residual functional capacity for medium work with the ability to push and pull with the bilateral lower extremities frequently; the ability to understand and remember instructions for simple tasks; the ability to sustain attention and concentration; to complete simple, repetitive tasks that do not require fast pace; the ability to interact appropriately with others on an occasional and superficial basis; the ability to adapt to a setting where duties are relatively static and changes are infrequent. Would that individual be able to perform any of the work the Claimant performed in the past?

(*Id.* at 87-88.)

The VE testified the hypothetical individual would be able to perform Fields' past work as a kitchen helper and laundry laborer as set forth in the DOT but could not perform Fields' past work as a laundry laborer as performed. (*Id.* at 88.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Fields was insured on his alleged disability onset date, June 1, 2018, and remains insured through December 31, 2023, his date last insured ("DLI"). (Tr. 10.) Therefore, in order to be entitled to POD and DIB, Fields must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

11

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since June 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: major joint dysfunction (hallux valgus of the bilateral feet, osteoarthritis of the left foot, status post left first metatarsal phalangeal joint arthrodesis); essential hypertension; depressive, bipolar, and related disorders (adjustment disorder with mixed anxiety and depressed mood and bipolar I disorder); anxiety disorders (anxiety state unspecified); and substance addiction disorders, alcohol (alcohol use disorder) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except with the ability to push/pull with the bilateral lower extremities frequently; the ability to understand and remember instructions for simple tasks; the ability to sustain attention and concentration to complete simple, repetitive tasks that do not require fast pace; the ability to interact appropriately with others on an occasional and superficial basis; and the ability to adapt to a setting where duties are relatively static and changes are infrequent.

6. The claimant is capable of performing past relevant work as a laundry laborer and kitchen helper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2018, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 12-27.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a

13

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### VI. ANALYSIS

In his second assignment of error, Fields asserts the ALJ "failed to properly evaluate the totality of the evidence in the record when she formed the RFC." (Doc. No. 15 at 9.) Fields argues in part that while the ALJ found he "'would have difficulty with particular activities, including prolonged standing, walking, and sitting,'" the ALJ determined Fields could perform medium work, which requires a good deal of standing and walking. (*Id.* at 10.) Fields asserts the ALJ's RFC therefore lacks substantial evidence. (*Id.* at 11.) Fields further maintains the ALJ failed to build an accurate and logical bridge between the evidence and her conclusions. (*Id.* at 13.)

The Commissioner failed to respond to this argument in responding to Fields' second assignment of error. (Doc. No. 19.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered*. See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to

acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

After reviewing the relevant medical evidence, the ALJ found as follows:

> The foregoing objective medical record contains evidence of essential hypertension with elevated blood pressure levels and major joint dysfunction, namely hallux rigidus/hallux valgus of the bilateral feet, osteoarthritic changes of the first MPJ, status post 1st MPJ arthrodesis of the left foot with nonunion, and metatarsalgia, status post dorsiflexory metatarsal osteotomy of the left 4th metatarsal, with tenderness, swelling/edema, erythema, decreased range of motion, and an occasionally stiff, slow gait on examination (Exhibit 1F, 3F, 5F, 6F, 9F, 10F, 11F, 8F). *This evidence indicates the claimant would have difficulty with particular activities, including prolonged standing, walking, and sitting, thereby confirming a limitation to work at the medium exertional level, where he is expected to lift and carry 50 pounds occasionally and 25 pounds frequently, and stand, walk, and sit up to 6 hours in an 8-hour workday.* The record contains allegations of greater functional limitations (Exhibit 11E, Hearing Testimony); however, the record is absent sufficient objective evidence to support said allegations, as examinations have confirmed otherwise normal range of motion, full lower extremity strength, normal pulses, intact lower extremity sensation, and a generally normal gait with independent ambulation (Exhibit 1F, 3F, 5F, 6F, 9F, 10F, 11F). Thus, the claimant retains sufficient residual functional capacity to perform the reduced exertional requirements of medium work. Nevertheless, given the findings on

> diagnostic imaging of the bilateral feet, the claimant's surgical history, and examination findings of lower extremity tenderness, swelling/edema, erythema, and decreased range of motion, the undersigned limits the claimant to frequent pushing/pulling with the bilateral lower extremities (*Id.*). However, additional manipulative, postural, or environmental restrictions are not warranted, given the aforementioned evidence of otherwise normal range of motion, full lower extremity strength, normal pulses, intact lower extremity sensation, and a generally normal gait with independent ambulation on examination (Exhibit 1F, 3F, 5F, 6F, 9F, 10F, 11F).

(Tr. 21) (emphasis added).

Fields' argument that the ALJ failed to build an accurate and logical bridge from the evidence to her conclusions and that the RFC lacks substantial evidence is well-taken. The ALJ's finding that Fields would have difficulty with prolonged standing and walking is inconsistent with the ALJ's finding that Fields was capable of standing and walking for up to six hours in an eight-hour workday. (*Id.*) *See also* SSR 83-10, 1983 WL 31251, at **6-7 ("A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time."). As set forth above, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. Therefore, this matter must be reversed and remanded.

As this matter is being remanded for further proceedings consistent with this opinion, and in the interests of judicial economy, the Court will not address Fields' remaining assignments of error.

### VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

**IT IS SO ORDERED.**

Date: November 30, 2021                        *s/ Jonathan Greenberg*
                                                                    Jonathan D. Greenberg
                                                                    United States Magistrate Judge